IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CLAYTON JACOB DANNENMILLER and SCOTT EUGENE KAHNS, | No. 87652-0-I |
| Respondents, | |
| v. | DIVISION ONE |
| JANICE G. KEMMING, | UNPUBLISHED OPINION |
| Appellant. | |

CHUNG, J. — Janice Kemming appeals from the trial court's order granting summary judgment to Clayton Dannenmiller and Scott Kahns, removing her as co-trustee, and awarding attorney fees and costs. Kemming asserts that her declaration and the declaration of a medical expert raised a triable issue of fact as to the validity of the amendment to the Samuel and Margie King Living Trust, which precluded summary judgment. We disagree, affirm the trial court, and award Dannenmiller and Kahns their attorney fees.

FACTS

Samuel and Margie King, a married couple, created the Samuel and Margie King Living Trust ("the Trust") in 1993 and restated it on June 7, 2000. Under the original terms of the Trust, upon the second of the Kings to die, their real and personal property would be transferred to Samuel's two children, Gary Vance King and Richard Henry King, and Margie's two children, Patricia Dannenmiller and Janice Kemming, with

Samuel's children receiving a greater share of the property than Margie's.[1] The Kings appointed themselves as co-trustees of the Trust and named Patricia and Kemming to serve as co-trustees following the Kings' deaths. Clayton Dannenmiller and Scott Kahns, who are Patricia's sons and the Kings' grandsons, were not named as beneficiaries under the original terms of the Trust.

The Kings also each executed pour-over wills, distributing all of their property into the Trust upon their deaths. Both wills appointed the other spouse to act as personal representative and named Patricia and Kemming to serve as co-personal representatives in the event of the other spouse's inability or unwillingness to serve.

In 2019, the Kings reached out to attorney Timothy Lehr to update their estate planning. The Kings first met with Lehr at their home on November 13, 2019. At the time, Dannenmiller and Kahns had been tending to cattle and working the farm on the Kings' 70-acre property for approximately six years, after Samuel became too old to manage the farm on his own. According to Lehr, "[t]he Kings made clear their intent was that their grandsons would keep the property in the family and keep working the property as Sam and Margie had for decades." The Kings met with Lehr again on December 9, along with their financial advisor Mike Rue, with whom they had worked for the previous 13 years. At this meeting, the Kings asked Rue to consolidate all of their financial accounts into one "Transfer on Death" account. Dannenmiller and Kahns were not made beneficiaries of the Transfer on Death account, as they were to get the

---

[1] Because Patricia shares a last name with one of the Respondents, we use her first name to avoid confusion. We refer to Samuel and Margie King as "the Kings" collectively and use their first names when referring to them individually, also to avoid confusion.

family farm instead. Patricia was present at both meetings, but according to Lehr and Rue, did not participate in the substantive discussions about the Kings' wishes.

On February 5, 2020, the Kings executed an amendment to the Trust naming Dannenmiller and Kahns as the sole recipients of the Kings' real property. All other provisions of the Trust remained in full force and effect. On the same date, the Kings also signed a power of attorney and a healthcare directive. Lehr, Rue, and Patricia were all present when the Kings signed the Trust amendment, power of attorney, and healthcare directive. None of them perceived any issues with the Kings' capacity to sign their updated estate planning documents. Lehr and Rue also did not perceive that Patricia was exerting any control over the Kings during these meetings.

In October 2019, Kemming traveled to Washington from Colorado to visit Margie in the hospital. According to medical records dated October 13, Margie's daughter reported that Margie had experienced a fall several days prior "though the patient does not remember the incident." Kemming expressed concern to Patricia that Margie may need a guardianship in light of her declining physical and cognitive health. Kemming ultimately did not petition for a guardianship because she believed that Patricia could handle their concerns through the power of attorney.

In June 2020, Margie King was hospitalized after sustaining another fall. Hospital staff noted that she had "poor [medical] history recollection." Patricia did not want Margie to return home, as she and Samuel King both believed that they would not be able to physically get Margie out of the car and into the house.

Margie was hospitalized multiple times in July 2020 and was diagnosed with unspecified altered mental status and problems with urination. On August 3, 2020,

medical records from another hospital visit noted that Margie's past medical history "is significant for Alzheimer's dementia" which "seems to be somewhat progressive."

Margie King died on November 28, 2020. Samuel King died on December 8, 2021. Despite acting as co-trustee, Kemming did not transfer the real property to the beneficiaries designated in the Trust amendment. Kemming also failed to make arrangements to pay property taxes, utilities, and upkeep costs on the real property for over one year.

On April 13, 2022, Kemming filed a Trusts and Estates Dispute Resolution Act (TEDRA) petition in Skagit County Superior Court, alleging that Margie King lacked the capacity to amend the Trust in 2020. Subsequently, Kemming took no action in the matter for over one year. On July 10, 2023, Dannenmiller and Kahns filed a TEDRA petition requesting that Kemming be removed as co-trustee for breaching her fiduciary duties and the terms of the Trust.

The two TEDRA actions were consolidated on August 11, 2023. Later that month, the court issued a discovery order pursuant to RCW 11.96A.100(10) and 11.96A.115, ordering that the following materials were subject to discovery in the consolidated proceeding:

1. All financial accounts of Margie and Samuel King (the "Deceased") and of the Trust;
2. Discovery from any law firms that were involved in making the Trust, the Pour Over Wills, and/or the First Amendment to the Trust, including, but not limited to, Stiles Law, Inc., P.S., and John J. Kamrar, Attorney at Law, P.S.;
3. All correspondence between the Deceased and the Beneficiaries of the Trust regarding the Trust or any Trust assets;
4. All medical records of the Deceased during the last ten (10) years;
5. Correspondence between financial advisors, specifically Michael Rue of Evergreen Wealth Managers, and the Deceased; and
6. Any materials between the parties related to the Trust.

The court declined to appoint an independent personal representative at that time but indicated that if either party "run[s] into a quandary, then we can appoint a [personal representative], if needed."

Kemming issued subpoenas to seven medical providers requesting Margie and Samuel King's medical records. Between November 2023 and January 2024, Kemming received medical records from three providers. Kemming's counsel believed that some records were omitted from production, although he did not specify what he believed to be missing. It is not clear from the record whether Kemming issued any additional subpoenas, discovery requests, or deposition notices to other parties or witnesses.

Dannenmiller and Kahns filed a motion for summary judgment on the claims asserted in their TEDRA petition on July 3, 2024. Kemming filed a response asking that the motion be denied and, in the alternative, that the motion be continued under CR 56(f) so that she could obtain additional discovery. The court granted Kemming's CR 56(f) motion, continued the hearing to August 22, then continued it again until October 31 after a substitute judge recused himself. On September 6, 2024, the court appointed an independent personal representative to waive medical and attorney-client privileges held by the decedents.

In her supplemental response to the summary judgment motion, Kemming requested that Patricia be removed as a trustee and an independent person be appointed to act in that capacity. Kemming did not request an additional continuance.

In support of her supplemental response, Kemming submitted the declaration of William J. Newman, MD, a professor of psychiatry at universities in Texas and Oklahoma. Dr. Newman opined that Margie had Alzheimer's disease and "would likely

5

have been unable to properly understand and appreciate the legal consequences of any legal document she was provided in February of 2020." Dr. Newman further opined that "[i]t would be highly unusual for someone who is diagnosed with chronic advanced Alzheimer's disease, in July or August 2020, to not exhibit the signs and symptoms of Alzheimer's disease, for a substantive period of time prior to that diagnosis, likely years." Dr. Newman also stated that "[b]eing unable to recall an event such as a fall, demonstrates Ms. King's cognition was impaired in at least October 2019."

The trial court granted Dannenmiller and Kahns' motion for summary judgment. The court concluded that Kemming had breached her duties as trustee by "refusing to distribute the Family Farm to Petitioners as required by the Amendment to the Trust, filing litigation to invalidate the Amendment, and failing to pay upkeep/general maintenance on the Family Farm." Kemming was removed as a trustee and ordered to pay attorney fees pursuant to RCW 11.96A.150 because the litigation was necessitated by the breaches of fiduciary duty and the terms of the Trust. The court declined to remove Patricia as a trustee and ordered that she distribute the real property pursuant to the terms of the Trust.

Kemming appeals.

ANALYSIS

On appeal, Kemming challenges the trial court's decision to grant summary judgment in favor of Dannenmiller and Kahns, alleging that she provided evidence to raise a genuine issue of material fact. She also challenges the trial court's award of attorney fees and costs to Dannenmiller and Kahns.

6

I.  Margie King's Capacity

We review orders granting summary judgment de novo.  Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). This requires the reviewing court to consider "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party."[2]  Id.  Summary judgment is appropriate when "there is no genuine issue as to any material fact," meaning the moving party is entitled to judgment as a matter of law. CR 56(c). A "material fact" is one that impacts the outcome of the litigation.  Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). Further, there is a genuine issue of material fact when "the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."  Keck, 184 Wn.2d at 370.

The party moving for summary judgment has the initial burden of showing the absence of an issue of material fact.  Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). A party moving for summary judgment can submit affidavits to demonstrate that no issue of material fact exists or can point out that the opposing party lacks competent evidence to support an essential element of their case. Id. at 225, 226 n.2. The burden then shifts to the opposing party, who must sufficiently demonstrate "the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." Id. at 225. The failure to make such a showing will result in the trial court granting summary judgment.  Id.

_____

[2] In its order granting summary judgment, the trial court entered numerous findings of fact. Findings of fact entered in a summary judgment order are nullities, unless they are not actually and in good faith controverted. Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 235, 522 P.3d 80 (2022) (citing Duckworth v. City of Bonney Lake, 91 Wn.2d 19, 21-22, 586 P.2d 860 (1978)); see also CR 56(d). In deciding this matter, we have disregarded the trial court's factual findings.

Kemming contends that the trial court erred by granting summary judgment to Dannenmiller and Kahns because she did not breach either her fiduciary duties or her duties under the terms of the Trust. Kemming asserts that Margie lacked capacity to change the terms of the Trust in February 2020, and that, therefore, the amendment was invalid and she was not obligated to transfer ownership of the real property to Dannenmiller and Kahns.[3] We disagree.

A person executing a testamentary document, such as a trust, is said to have capacity if they have sufficient mind and memory to understand the transaction in which they are engaged, can comprehend generally the nature and extent of the property which constitutes her estate and of which she is contemplating disposition, and can recollect the objects of their bounty. In re Estate of Bottger, 14 Wn.2d 676, 685, 129 P.2d 518 (1942). Where a testamentary document is "rational on its face, is shown to have been executed in legal form, the law presumes that the testator had testamentary capacity and that the will speaks [their] wishes." Id.

To overcome the presumption of capacity, the challenger must present clear and convincing evidence of the signatory's lack of capacity. In re Estate of Riley, 78 Wn.2d 623, 646, 479 P.2d 1 (1970). Clear, cogent, and convincing evidence is a standard that is less than "beyond a reasonable doubt," but more than a mere "preponderance." Davis v. Dep't of Lab. & Indus., 94 Wn.2d 119, 126, 615 P.2d 1279 (1980). Rather, the evidence must be sufficient to convince the fact finder that the fact in issue is " 'highly probable.' " In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting

---

[3] Kemming does not assert that Samuel lacked capacity to sign the amendment to the Trust. Neither party has addressed whether the incapacity of one testator is sufficient to invalidate the trust, when there are other testators whose capacity is not challenged. Due to the lack of briefing on the issue, we do not address it.

Supove v. Densmoor, 225 Or. 365, 358 P.2d 734 (1972)). "When weighing summary judgment in a civil case in which the standard of proof is clear, cogent, and convincing evidence, the court determines whether a rational trier of fact could find from the evidence in the record that the nonmoving party satisfied this evidentiary burden." Tiger Oil Corp. v. Yakima County, 158 Wn. App. 553, 562, 242 P.3d 936 (2010) (citing Woody v. Stapp, 146 Wn. App. 16, 22, 189 P.3d 807 (2008)).

Here, Kemming did not present evidence sufficient to satisfy this standard. In response to the motion for summary judgment, Kemming submitted her own declaration, Margie's medical records, the declaration of an expert who examined those medical records, and police reports from July and August 2020. But much of this proffered evidence was not admissible. "Evidence considered on summary judgment must be admissible." Spohn v. Dep't of Lab. & Indus., 20 Wn. App. 2d 373, 378–79, 499 P.3d 989 (2021) (citing SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 141, 331 P.3d 40 (2014)).

First, the police reports Kemming submitted were not admissible as evidence. See Fite v. Mudd, 19 Wn. App. 2d 917, 936, 498 P.3d 538 (2021) ("Because police reports that include eyewitness testimony and the conclusions of officers are not objective records, they are not admissible under the business records exception" to the prohibition on hearsay). Similarly, most of Kemming's declaration recounts statements allegedly made by Patricia, which are inadmissible hearsay. See ER 801(d)(2); Desranleau v. Hyland's, Inc., 10 Wn. App. 2d 837, 844, 450 P.3d 1203 (2019) (hearsay only constitutes an admission of a party-opponent when used against the person who made the statement). When all of the inadmissible hearsay is removed from Kemming's

declaration, the only evidence left is her observation that Margie "was suffering mental confusion and was becoming fearful of things that appeared to be unfounded and unrealistic," and her impression that Margie was in need of a guardianship. However, neither mental confusion nor the need for a guardianship are clear and convincing evidence of incapacity. In re Estate of Kessler, 95 Wn. App. 358, 371, 977 P.2d 591 (1999) (lapses in memory alone do not establish incapacity); Bottger, 14 Wn.2d at 697 (guardianship does not establish incapacity).

What remains are Margie's medical records and Dr. Newman's declaration based on his review of those records. As Dannenmiller and Kahns point out, the majority of the records submitted to the court were from June through August 2020, several months after the Kings created and signed the amendment to the Trust. The records that predate the execution of the Trust amendment indicate that Margie could not remember a fall that occurred in September or October 2019 and that she had poor recollection of the onset of an illness in December 2019. But, " '[f]ailure of memory is not alone enough to create testamentary incapacity, unless it extends so far as to be inconsistent with the sound and disposing mind and memory requisite for all wills.' " Kessler, 95 Wn. App. at 371 (internal quotation marks omitted) (quoting In re Estate of Denison, 23 Wn.2d 699, 714, 162 P.2d 245 (1945)). While the records are evidence that Margie had difficulty recalling recent medical events, they go no further than that.

Dr. Newman's declaration also is not sufficient to create an issue of material fact under the clear and convincing evidence standard. Dr. Newman opined that Margie was "likely suffering from advancing Alzheimer's disease" in February 2020 and that "this condition would make it difficult for Ms. King to understand the legal significance of any

document she was signing." It is undisputed that Dr. Newman never met Margie King. Rather, Dr. Newman based his opinion on Margie's medical records, the majority of which post-date the execution of the Trust amendment by several months and which make no mention of Alzheimer's disease until August 2020.

Bottger is illustrative of evidence that fails to create a genuine issue of material fact under the clear and convincing evidence burden of proof. 14 Wn.2d 676. There, our Supreme Court reversed a judgment invalidating a will based on the supposed incapacity of the testator. Id. at 707-08. The evidence presented by the party challenging the will consisted of testimony from (1) two lay witness who, though disinterested in the outcome, had limited interactions with the decedent, (2) the doctor who treated the decedent on her deathbed, nearly a year after the challenged will was signed, and (3) an expert who had never met the decedent, yet testified that the decedent was incompetent "[i]n response to a long hypothetical question propounded by respondents' counsel, which on its face called for an answer favorable to respondents." Id. at 689-94. The testimony of the expert witness, the court noted, was based not only on the decedent's medical records, but also on a number of assumptions, including that the decedent experienced lapses in memory, required a guardianship, and that her death was primarily caused by arteriosclerosis rather than the other three comorbid heart conditions listed on her death certificate. Id. at 694. The court referred to the testimony of the expert as "the weakest and most unsatisfactory sort" of evidence. Id.

The Bottger court contrasted the evidence presented by the will's challengers to the evidence presented by the proponents of the will, which consisted of the testimony of 14 lay witnesses who knew the decedent well and two physicians who had actually

11

examined the decedent around the time that she executed her will. Id. at 691-92. The court held, in light of the presumption of competency and heightened burden of proof upon the challengers, the evidence presented by the will's challengers was insufficient to prove incapacity and that the will's proponents were entitled to judgment as a matter of law. Id. at 698.

Like the expert's testimony in Bottger, Dr. Newman's declaration similarly is based not only on his review of Margie's medical records but also on some assumptions about her condition's effect on her capacity. Dr. Newman states that Margie was "diagnosed with chronic advanced Alzheimer's disease, in July or August 2020" and that it "would be highly unusual for someone who is diagnosed . . . to not exhibit the signs and symptoms of Alzheimer's disease, for a substantive period of time prior to that diagnosis, likely years." But the medical records from August 2020 describe Margie having Alzheimer's dementia that "seems to be somewhat progressive," not "advanced," as Dr. Newman stated. Further, to reach his conclusion that it would be "highly unusual" for someone with advanced Alzheimer's not to exhibit symptoms for years prior to diagnosis and that Margie was incapacitated by Alzheimer's disease as early as February 2020, Dr. Newman assumed a certain course and rate of progression of the disease. Dr. Newman also opines that because Margie was "unable to recall an event such as a fall," her "cognition was impaired in at least October 2019." But, as noted above, some confusion or lapses in memory alone do not establish incapacity. See Kessler, 95 Wn. App. at 371.

Further, Kemming's only other evidence consists of two statements contained in her own declaration that "[b]efore December 31, 2019, I understood and believed a

guardianship was probably needed and appropriate for my mother because of her cognitive and physical decline" and "on October 4, 2019 . . . [i]t was clear to me . . . our mother was suffering mental confusion and was becoming fearful of things that appeared to be unfounded and unrealistic." This is far less than the evidence deemed legally insufficient in Bottger. Given the presumption of competency and Kemming's burden to overcome this presumption with clear and convincing evidence, the trial court was correct in concluding that Kemming did not present a triable issue of fact as to Margie's capacity.[4]

## II. Undue Influence

Kemming similarly argues that she was not obligated to transfer ownership of the real property to Dannenmiller and Kahns because the amendment to the Trust was invalid due to undue influence. Specifically, Kemming asserts that Patricia exercised coercion and undue influence over Margie by inducing her to sign the Trust amendment. We disagree.

A testamentary document may be deemed invalid, even where the executor had capacity, if a beneficiary exercised undue influence over the executor. Kessler, 95 Wn. App. at 376. To void a trust based on undue influence, there must be more than "mere influence." In re Estate of Lint, 135 Wn.2d 518, 535, 957 P.2d 755 (1998). Specifically, undue influence is influence

---

[4] To the extent that Kemming argues that she was not permitted to complete discovery due to the late appointment of an independent personal representative, we note two things. First, after receiving a two-month continuance under CR 56(f), Kemming did not request a continuance when she submitted a supplemental response to the motion for summary judgment or at the hearing on October 31, 2024. Second, the lack of a personal representative who could waive Margie's privilege did not prevent Kemming from issuing discovery requests or subpoenas to anyone who did not have privileged communications with Margie, including family, friends, neighbors, and her financial advisor. Kemming's lack of diligence does not demonstrate error by the trial court.

"which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice[,] . . . [i.e.,] influence tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will."

Id. (quoting Bottger, 14 Wn.2d at 700) (citations omitted). As with claims of incapacity, the party asserting undue influence has the burden to prove it by clear, cogent, and convincing evidence. Id. (citing In re Estate of Mitchell, 41 Wn.2d 326, 350, 249 P.2d 385 (1952)).

A presumption of undue influence may arise if the party presents evidence of what is commonly referred to as the Dean factors.

The most important of such facts are: (1) That the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will.

Dean v. Jordan, 194 Wash. 661, 672, 79 P.2d 331 (1938); see also Mueller v. Wells, 185 Wn.2d 1, 10-11, 367 P.3d 580 (2016) (holding that trial court's findings "established an unrebutted presumption of undue influence based on the Dean factors, supported by "further positive evidence," which together were sufficient to establish undue influence by clear, cogent, and convincing evidence). Where the presumption arises, the burden shifts to the proponents of the challenged document to produce evidence to rebut the presumption. Mueller, 185 Wn.2d at 15. Ordinarily, whether the factors raise a presumption of undue influence is a question of fact. Mueller, 185 Wn.2d at 9. However, "factual questions . . . may be resolved on summary judgment if, given the evidence in

the record, a court could reach only one reasonable result." Alaska Pac. Trading Co. v. Eagon Forest Prods., Inc., 85 Wn. App. 354, 361, 933 P.2d 417 (1997).

Kemming does not engage with the Dean factors in her brief and in fact does not engage in any legal analysis concerning undue influence at all. "A contention not supported by authority or argument need not be considered on appeal." Rhinehart v. Seattle Times, 59 Wn. App. 332, 336, 798 P.2d 1155 (1990) (citing RAP 10.3(a)(5)).

If this court were to engage with the Dean factors, Kemming is not entitled to the presumption of undue influence for one clear reason: Patricia was not named as a beneficiary in the amendment to the Trust.[5] Thus, under the third Dean factor, Patricia did not receive an unusually large part of the Kings' estate; rather, the amendment to the Trust *decreased* Patricia's share of the Kings' estate. This factor weighs heavily against application of the presumption. Moreover, Kemming makes no argument, and presents no evidence that the beneficiaries under the Trust amendment, Dannenmiller or Kahns, exercised any influence over the Kings related to the Trust. Nor does Kemming present any evidence or cite any legal authority by which a court could fairly impute Patricia's actions to her adult children. Therefore, the trial court correctly declined to apply a presumption of undue influence to Kemming's claim.[6]

---

[5] Patricia was named as a beneficiary under the original terms of the Trust and presumably received a share of the Kings' personal property. Kemming does not challenge Patricia's status as a beneficiary under the Trust's original terms.

[6] Even if we considered the other Dean factors, Kemming would still not be entitled to a presumption of undue influence. While Patricia was granted power of attorney for the Kings, this fact alone does not establish that Patricia had a fiduciary relationship with the Kings at the time they signed the Trust amendment. "Rather, a fiduciary relationship arises when the agent exercises dominion and control over the principal's property sufficient to alienate the principal's right to the property." In re Estate of Palmer, 145 Wn. App. 249, 263, 187 P.3d 758 (2008). The Kings signed the power of attorney held by Patricia on the same day as the Trust amendment. And the Trust amendment was signed by the Kings themselves, not by Patricia in her role as power of attorney. Because Kemming did not present evidence that Patricia had a fiduciary relationship with the Kings when the amendment was drafted and signed, this factor weighs against application of the presumption.

Because Kemming is not entitled to the presumption of undue influence, the burden did not shift to Dannenmiller and Kahns to present evidence to refute Kemming's claim. See Mueller, 185 Wn.2d at 15. Kemming was thus required to present evidence to raise a triable issue of fact that the Trust amendment was the product of undue influence. Kemming did not satisfy this burden. Kemming presented no evidence at all of any undue influence by Dannenmiller or Kahns and relied on speculation that Patricia unduly influenced Margie because she was a vulnerable adult. A party cannot defeat a motion for summary judgment by relying on " 'speculation and conclusory statements.' " Strauss v. Premera Blue Cross, 194 Wn.2d 296, 301, 449 P.3d 640 (2019) (quoting Volk v. DeMeerleer, 187 Wn.2d 241, 277, 386 P.3d 254 (2016)).

The evidence Kemming presented would not allow a rational trier of fact to find undue influence by clear, cogent, and convincing evidence. Accordingly, the trial court did not err by granting summary judgment to Dannenmiller and Kahns.

III. Kemming's Breach of Duties as Trustee

Kemming nevertheless asserts that she did not breach her duties as co-trustee because she acted within her discretion. "[A] trustee is a fiduciary who owes the highest degree of good faith, diligence and undivided loyalty to the beneficiaries." In re Estate of

---

Second, while Kemming alleged that Patricia actively participated in the preparation of the Trust, the Kings' attorney, their financial advisor, and Patricia herself all testified in their declarations that Patricia did not participate in any substantive discussions about the content of the amendment. Kemming presented no evidence to refute this.

Third, the amendment to the Trust was not unnatural. The unrefuted evidence showed that Dannenmiller and Kahns, the Kings' grandsons, raised cattle and maintained the farm on the Kings' real property for approximately six years prior to the amendment of the Trust, as Samuel became too old to perform this work. It is natural that the Kings would wish to bequeath their farm to the relatives that were devoted to maintaining it. Overall, no reasonable fact finder could determine that the age and health of the testators and the opportunity for exerting undue influence outweigh the other Dean factors as outlined above.

Ehlers, 80 Wn. App. 751, 757, 911 P.2d 1017 (1996) (citing Estate of Jordan v. Hartford Accident & Indem. Co., 120 Wn.2d 490, 502, 844 P.2d 403 (1993); Wilkins v. Lasater, 46 Wn. App. 766, 774, 733 P.2d 221 (1987)). "A trustee's duties and powers are determined by the terms of the trust, by common law and by statute." Id. While a trustee may, in certain circumstances, have discretion over management of the trust, the trustee does not have the discretion to disregard the terms of the trust. See Retail Store Emp. Union, Local 1001 Chartered By Retail Clerks Int'l Ass'n, AFL-CIO v. Washington Surveying & Rating Bureau, Washington Bureau, 87 Wn.2d 887, 904, 558 P.2d 215 (1976) (trustee can exercise only those powers conferred in specific words by the trust or that are necessary or appropriate to carry out purposes of trust).

"The trustee *must* carry out the intent of the settlor as determined by the terms of the trust." Conserv. Nw. v. Comm'r of Pub. Lands, 199 Wn.2d 813, 829, 514 P.3d 174 (2022) (emphasis added) (citing RESTATEMENT (THIRD) OF TRUSTS § 76). Here, the terms of the Trust clearly state "[u]pon the death of the second one of us to die, our Trustee shall distribute, free of the trust, the specific distributions of trust property" delineated in the Trust document. The amendment to the Trust dictated that "our Trustee shall distribute [the family farm] equally to SCOTT [] KAHNS and CLAYTON [] DANNENMILLER." Nevertheless, Kemming admitted that in her capacity as trustee, she did not distribute the real property as the Trust required.

Additionally, common law dictates that the trustee "use reasonable care and skill to preserve the trust property." RESTATEMENT (SECOND) OF TRUSTS § 176 (1959). Kemming admitted that she did not pay for any upkeep of the property for over one year, nor did she pay any of the property taxes, which could have subjected the

17

property to foreclosure had Dannenmiller and Kahns not paid the taxes on the Trust's behalf. Based on her own admissions, the trial court did not err by concluding that Kemming had breached her duties as trustee.

The trial court also did not err by removing Kemming as a trustee. "A court has a 'wide latitude of discretion' to remove the trustee, 'when there is sufficient reason to do so to protect the best interests of the trust and its beneficiaries.' " In re Estate of Cooper, 81 Wn. App. 79, 94-95, 913 P.2d 393 (1996) (quoting Schildberg v. Schildberg, 461 N.W.2d 186, 191 (Iowa 1990)). One valid reason to remove a trustee is a conflict of interest between the trustee and the other beneficiaries of the trust. Waits v. Hamlin, 55 Wn. App. 193, 198, 776 P.2d 1003 (1989). Here, if Kemming succeeded on her TEDRA petition, the original terms of the trust would control. Those terms gave her an interest in the real property described in the amendment. This created a conflict of interest between her and the beneficiaries of the real property under the amendment, Dannenmiller and Kahns. Thus, even if Kemming had not breached her duties as fiduciary, the court had ample reason to remove her as a trustee. Kemming fails to demonstrate any error by the trial court.

## IV.  Attorney Fees

Kemming contends that the trial court erred by awarding attorney fees to Dannenmiller and Kahns because their TEDRA petition did not benefit the Trust. In awarding fees to the respondents, the trial court was not required to consider whether there was any benefit to the Trust. See RCW 11.96A.150(1) ("In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation

benefits the estate or trust involved."). The cases on which Kemming relies to argue otherwise all concern fees that were awarded against the trust itself. Here, the trial court did not award fees against the Trust—it awarded fees against Kemming personally. Kemming makes no argument that the trial court erred by awarding fees against her personally. We therefore affirm the trial court's award of fees to Dannenmiller and Kahns.

Both parties request an award of fees on appeal. RAP 18.1(a) allows us to award reasonable attorney fees or expenses "[i]f applicable law grants to a party the right to recover" such attorney fees or expenses. RCW 11.96A.150 states that "[e]ither the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings." RCW 11.96A.150(1)(a) "Ordinarily, the trust estate must bear the general costs of administration of the trust, including the expenses of necessary litigation. Where litigation is necessitated by the inexcusable conduct of the trustee, however, the trustee individually must pay those expenses." Allard v. Pac. Nat. Bank, 99 Wn.2d 394, 408, 663 P.2d 104 (1983) (citations omitted). As in Allard, the trustee in this matter–Kemming–breached her fiduciary duty to the beneficiaries of the Trust. Having prevailed in this appeal, Dannenmiller and Kahns are entitled to an award of fees against Kemming, contingent upon their compliance with the applicable procedural requirements. Because Kemming is not the prevailing party, we decline her request for an award of fees.

CONCLUSION

Affirmed.

_____ Chung, J.

WE CONCUR:

_____ Feldman, J.

_____ Smith, J.